**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISON**

HOOK CHOK and DONG PAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

AUSTIN RUSSELL, and TOM FENNIMORE,

Defendants.

Case No. 6:25-cv-1384-CEM-NWH

CLASS ACTION

AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**


I. SUMMARY OF THE ACTION ........................................................2

II. JURISDICTION AND VENUE ........................................................4

III. PARTIES ........................................................5

A. Plaintiffs ........................................................5

B. Defendants ........................................................5

IV. SUBSTANTIVE ALLEGATIONS ........................................................8

A. Background ........................................................8

B. Defendants Touted Luminar's Iris Project And Partnerships With Volvo And Mercedes-Benz, Despite Defects With Iris And Deterioration Of Those Partnerships ........................................................9

C. As The Company Faced These Challenges, Russell Took His Private Jet Around The World, Often With Family In Tow, And Spent Company Money Extravagantly ........................................................21

*1. Defendants Assured Investors That They, And The Company, Were Committed To The Company's Code of Ethics* ........................................................21

*2. SEC Rules Require Disclosure Of Perquisites To Executive Officers* ........................................................26

*3. Defendants Represented That Russell Received Zero Perquisites In 2021 Through 2023, And That Subsequent Perquisites Were Limited to Personal Security Expenses* ........................................................27

*4. Russell Received Improper And Misrepresented Perquisites, Including for Family Members, and Spent Company Funds Extravagantly in Violation of the Code of Ethics* ........................................................29

D. In 2024, The Company Began Investigating Defendant Russell, Leading to His Sudden Departure ........................................................36

E. Following the Class Period, the Company Filed for Bankruptcy ........................................................37

V. DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS ........................................................39

A. Defendants' Misrepresentations Regarding Luminar's LiDAR Technology and Customer Relationships ..............................39

B. Defendants' Misrepresentations Regarding Russell's Compensation and Perquisites ..........................................................43

C. Defendants' Misrepresentations Regarding Their, and the Company's, Commitment to Ethics ......................................45

VI. LOSS CAUSATION ..........................................................................47

VII. ADDITIONAL ALLEGATIONS OF SCIENTER .......................................51

VIII. CLASS ACTION ALLEGATIONS ...........................................................53

IX. COUNTS ..................................................................................................57

PRAYER FOR RELIEF ..............................................................................60

DEMAND FOR TRIAL BY JURY ...............................................................61

This is a federal securities class action brought on behalf of purchasers of common stock of Luminar Technologies, Inc. ("Luminar" or the "Company") between March 1, 2022, and October 31, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants'[1] violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 CFR 240.10b-5.

Court-appointed Co-Lead Plaintiffs Hook Chok and Dong Pan (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon investigation by counsel, including, among other things, review and analysis of public filings made by the Company with the United States ("US") Securities and Exchange Commission ("SEC"); review and analysis of press releases and other publications disseminated by the Defendants; review and analysis of news articles and conference call transcripts; review and analysis of other publicly available information concerning Defendants; review and analysis of other publicly

[1] The Defendants are Austin Russell and Thomas J. Fennimore. On December 15, 2025, Luminar filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and that bankruptcy proceeding is ongoing. Therefore, this action is stayed with respect to Luminar pursuant to 11 U.S.C. § 362(a). In the event the stay is lifted, Plaintiffs reserve all rights to assert claims against Luminar, including by amending their allegations to name Luminar as a defendant.

available information; and information from former Luminar employees. Plaintiffs believe that substantial additional evidentiary support will support their allegations after a reasonable opportunity for discovery.[2]

## I. SUMMARY OF THE ACTION

1. This action seeks to recover damages for Luminar's stockholders, who have suffered damages after buying Luminar's common stock at prices artificially inflated by Defendants' misstatements concerning (a) the Company's flagship "Iris" LiDAR (Light Detection and Ranging) technology and (b) their and Company's ethics commitments and the perquisites given to the Company's co-founder and former CEO, Defendant Austin Russell.

2. Luminar was focused on developing cutting-edge LiDAR technology for use in passenger and commercial vehicles. LiDAR technology is capable of using laser pulses to generate detailed images or maps of space, which can be used in vehicles to enable advanced driver-assistance and autonomous-driving features. During the Class Period, Defendants repeatedly touted Luminar's progress developing its "Iris" LiDAR system to a point where it could be and manufactured at scale and integrated into specific vehicle models. Defendants emphasized the Company's partnership with marquee customers such as Mercedes-Benz and, in particular, Volvo as validation of its technology and prospects. Defendants reassured

---

[2] Emphases herein are added unless otherwise noted.

investors that "***Luminar has made the investments that it needed to make***" and could "ride the tailwinds" of that investment, ***had " successfully ramped [] production to meet all key Volvo deliverables," and was "***meeting ***Volvo's*** key volume and quality requirements." However, per former Luminar employees, the Company's LiDAR technology was defective, not ready to be deployed in consumer vehicles, and could not be manufactured at scale due to certain design features. Defendants did not disclose these facts. Rather, they issued guidance for 2025 reflecting sales of tens of thousands of Iris LiDAR units, continuing to mislead investors until Volvo wound down the partnership, after which the Company plunged into bankruptcy.

3. In addition, throughout the Class Period, Defendants assured investors that Luminar had adopted a Code of Business Conduct and Ethics ("Code of Ethics" or "Code") that applied to all of its employees, directors, and executives – including its C-suite executives – and that they were "committed" to operating ethically. Further, Defendants represented that any perquisites extended to Defendant Russell, the founder and then-CEO, were limited to necessary personal security measures. In fact, Russell's perquisites included luxury travel expenses, including private jets and hotel reservations costing $15,000 per night, not only for himself but for members of his family. Further, Russell spent prodigious amounts of Company funds on trips to Formula One races and yacht rentals for parties. Russell's conduct violated the

Company's Code of Ethics, leading to an internal investigation that began no later than August 2024, which was not disclosed to investors. Then, on May 14, 2025, investors were shocked when Russell stepped down "effective immediately, following a Code of Business Conduct and Ethics inquiry by the Audit Committee of the Board of Directors," leading to a 16.80% drop in the Company's stock price.

4. At the start of the Class Period, the Company's stock traded at over $227 per share. By the end of the Class Period, it had fallen over ***99%*** to $1.16 per share. Subsequent to the Class Period, the Company filed for bankruptcy, and is pursuing a liquidation and the sale of one of its subsidiaries to a third party. This action seeks to recover the massive losses suffered by the Company's investors.

## II. JURISDICTION AND VENUE

5. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a).

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27(c) of the Exchange Act, 15 U.S.C. § 78aa(c). Defendants conduct business in this Judicial District and the Company maintains its principal executive offices in this District, at 2603 Discovery Drive, Suite 100, Orlando, Florida 32826. Further, during the Class Period, the Company's Class A common stock traded on

the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "LAZR" and, per the Company's most recent quarterly report, filed with the SEC on November 13, 2025, there were over 72 million shares of Class A common stock outstanding as of November 10, 2025. Accordingly, there are presumably hundreds, if not thousands, of investors in the Company's Class A common stock located within the US, some of whom undoubtedly reside in this Judicial District.

8. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

9. Plaintiffs acquired the Company's Class A common stock at artificially inflated prices during the Class Period, as set forth in their previously filed Certifications (ECF Nos. 23-4 and 25-2), and were damaged upon the disclosure of the true facts and the materialization of the risks concealed and misrepresented by Defendants.

### B. Defendants

10. Defendant Austin Russell ("Russell") co-founded the Company in 2010. Prior to and throughout the Class Period, Russell served as the Company's President and Chief Executive Officer, as well as the Chairman of its Board of

Directors ("Board"). The Company announced on May 14, 2025, that Russell had resigned from all three of these positions one effective immediately, though Russell remained a member (but not Chairman) of the Board. Since prior to the Class Period, Russell has held more than 50% of the total voting power of the Company's stockholders as a result of his ownership of all outstanding shares of the Company's Class B common stock, each share of which is entitled to ten votes.[3]

11. Defendant Thomas J. Fennimore ("Fennimore") joined the Company in July 2020 as its Chief Financial Officer. Prior to that, Fennimore served as the Global Head of Automotive and the Co-Head of the Industrials Group at Jefferies Group, LLC from September 2014 to May 2020. From July 1997 to September 2014, Fennimore worked at Goldman Sachs, including as Global Head of Automotive and Co-Head of the Asia Industrials Group. On October 31, 2025, the Company announced that Fennimore would step down as CFO effective November 13, 2025 "to pursue other career opportunities."

12. Defendants Russell and Fennimore are collectively referred to herein as "Defendants."

[3] Russell held 82.8% of the voting power of the Company's outstanding capital stock as of December 31, 2020; 79.5% as of December 31, 2021; 78.3% as of December 31, 2022; 75.4% as of December 31, 2023; 56.1% as of December 31, 2024; and 47.7% as of June 30, 2025.

13. Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. Defendants were provided with copies of the Company's SEC filings, press releases, and other market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Indeed, both Defendants signed and certified the Company's annual reports on Form 10-K for 2021, 2022, 2023, and 2024 (the "2021 10-K," "2022 10-K," "2023 10-K," and "2024 10-K," respectively)[4] and Defendant Russell signed the 2023 Proxy Statement and 2024 Proxy Statement (each of which is defined below). Because of their positions at the Company, and their access to material information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. Defendants are liable for the false and misleading statements and omissions pleaded herein.

[4] Defendants also signed and certified the amended 2024 10-K filed on April 30, 2025 (the "2024 10-K/A").

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

14. Luminar was founded in 2012 by Russell and Jason Eichenholz, when Russell was 16 years old. The following year, Russell received a Thiel Fellowship, which was created by Peter Thiel and others, and is open to recipients under the age of 22. Fellowship recipients receive $200,000 over the course of two years, but must skip or drop out of college to focus on a project. After receiving the fellowship, Russell dropped out of Stanford University, which he had attended for three months, to devote his time to Luminar.

15. Luminar focused on developing LiDAR technology for use in both passenger and commercial vehicles, including to facilitate their autonomous operation. Unlike radar, which uses radio waves, LiDAR uses light in the form of laser pulses, which can create a more precise, higher-resolution map of an environment. The Company claimed that its LiDAR sensors provide precise, three-dimensional sight in all lighting conditions, even in blinding light or of dark objects at night up to 300 meters away. Luminar touted its LiDAR technology as capable of enabling higher speed highway autonomy than competitors because it operates with a higher wavelength laser that detects objects further away.

16. The first LiDAR model the Company brought to the consumer vehicle market, which it called Iris, is a high performance, long-range sensor. Iris and its

variants feature a vertically integrated receiver, detector, and application-specific integrated circuit (ASIC). The Company announced Iris's launch shortly after partnering with Volvo in 2020, as further discussed below.

17. In August 2020, Luminar agreed to be bought by a special purpose acquisition company ("SPAC"), which is a non-operating company established with the purpose of acquiring another business. As a result of that business combination, which was completed in December 2020, Luminar became a publicly traded company. Russell was reported to be the world's youngest self-made billionaire as a result of his ownership of Company stock.

### B. Defendants Touted Luminar's Iris Project And Partnerships With Volvo And Mercedes-Benz, Despite Defects With Iris And Deterioration Of Those Partnerships

18. Luminar's focus was on its Iris LiDAR system, which it described in 2021 as a sensing and software platform designed to meet the performance requirements necessary for autonomous driving. According to the Company's annual report on Form 10-K for 2021 (the "2021 10-K"), "Iris is designed to be an efficient, automotive-grade, and affordable solution for series-production programs starting production in late 2022 or early 2023."

19. According to Luminar,

> Iris lidar combines laser transmitter and receiver and provides long-range, 1550 nm sensory meeting OEM[5] specs for advanced safety and autonomy. This technology provides efficient automotive-grade, and affordable solutions that are scalable, reliable, and optional for series production. Iris lidar sensors are dynamically configurable dual-axis scan sensors that detect objects up to 600 meters away over a horizontal field of view of 120° and a software configurable vertical field of view of up to 30°, providing high point densities in excess of 200 points per square degree enable long-range detection, tracking, and classification over the whole field of view. Iris is refined to meet the size, weight, cost, power, and reliability requirements of automotive qualified series production sensors. Iris features our vertically integrated receiver, detector, and laser solutions developed by our Advanced Technologies & Services segment companies - Freedom Photonics, Black Forest Engineering, and Optogration.

20. In addition to Iris, the Company has engaged in developing core sensor software to "help our commercial partners to operate, integrate, and control our LiDAR sensors" and perception software to "transform lidar point-cloud data into actionable information about the environment surrounding the vehicle."

21. In March 2020, the Company entered into a Framework Purchase Agreement (the "FPA") with Volvo to equip Luminar products into Volvo's next-generation vehicle platform ("SPA2"), with the SPA2 program intended to serve as a model for future vehicle lines for Volvo and Polestar (formerly Volvo's electric car division, in which Volvo maintains a stake and produces vehicles that share significant design elements with Volvo vehicles). SPA2's primary aim was to enable

---

[5] "OEM" means "original equipment manufacturer," and was used by Defendants to refer to car makers such as Volvo.

highway autonomous drive capability as an option on consumer vehicles, with series production expected to start in 2022. In addition, the program presented a simultaneous opportunity to enable next-generation proactive safety systems in a more widespread capacity at lower cost than autonomous drive upgrades.

22. In May 2020, the Company announced a "production deal for autonomous consumer vehicles with Volvo Cars," which it hailed as a "landmark." According to the Company, "[a]s a result [of this agreement], our hardware and software could power Volvo's next-generation vehicle platform, called SPA2, on which its future consumer vehicle models will be based. The intent of the program is primarily to enable highway autonomous drive capability as an option on production consumer vehicles, with series production expected to start in 2022."

23. The Company also announced deals with Daimler Truck AG (purportedly "the world's largest commercial vehicle manufacturer") and Intel's Mobileye (which develops driver assist and autonomous driving technologies) in 2020.

24. In January 2022, the Company announced a "partnership with Mercedes-Benz to accelerate the development of future highly automated driving technologies for Mercedes passenger cars," specifically the Company's Iris system.

25. In the first quarter of 2023, Defendants announced an expansion of the Company's partnership with Mercedes-Benz, stating that Mercedes-Benz

"plan[ned] to integrate our Iris+ LiDAR, and associated technology, across a broad range of its next-generation production vehicle lines by late-decade as optional equipment."

26. During the Class Period, the Company was highly dependent on its relationships with Volvo and Mercedes-Benz, among very few key customers. In 2023, 2022 and 2021, the Company's top 10 customers (including those two) represented 66%, 69% and 87% of its revenue, respectively. And, in Luminar's bankruptcy filing after the Class Period, its Chief Restructuring Officer referred to Volvo as the Company's "marquee customer."

27. According to Defendants, in the third quarter of 2023, the Company passed the two Run at Rate production audits for Volvo Cars at the manufacturing facility in Mexico, which were purportedly critical milestones ahead of start of production ("SOP") and "indicate[d] that we manufactured our LiDAR at the required production rates and necessary quality standards." Defendants also announced that the Company's "Iris LiDAR also completed one of the first official installations onto a Volvo EX90 at Volvo's Charleston plant in the US."

28. On April 23, 2024, Defendants announced that the Company had achieved "start of production for Volvo Cars and begun delivering production LiDAR sensors for the Volvo EX90, which will be the first global production vehicle to feature and standardize this technology." Defendants represented that, as a result

of this development, they expected Luminar "to ship multiple times more product in the second half of 2024 than it has in the prior 10 years and accelerating from there." As a result of this purported start of production, Defendants said the Company would begin to convert its $3.8 billion "order book" to revenue.

29. However, the Company's relationships with both of these key customers – Mercedes-Benz and Volvo – had already begun to fray. In early 2024, Volvo notified Luminar that it was reducing its expected volume of Iris LiDAR units for 2024 by approximately 75%. Luminar reduced 2024 guidance in light of this, but Defendants reassured investors that it would achieve the guidance in 2025.

30. Indeed, Russell assured investors that

> the important point here, though, is that ***Luminar has made the investments that it needed to make***. Now, for the first time, we get to ride the tailwinds of this investment to be able to successfully scale with our business, introduce these new technologies that we've invested previously to be able to develop and, at the same time, be able to substantially reduce costs overall for the business on an ongoing basis as a result of the fundamental technology platform that we've created.

31. Thus, Russell represented investors that the delay was on Volvo's side and that Luminar was ready. Similarly, four months later, on August 6, 2024, Russell told investors that "***We've since successfully ramped our production to meet all key Volvo deliverables*** and we're looking forward to seeing them continue to scale."

32. In November 2024, Mercedes-Benz cancelled its production deal with Luminar for Iris LiDAR technology, claiming that Luminar breached the agreement by failing to meet certain development requirements.

33. Defendants did not disclose this development until March 20, 2025, when they obliquely mentioned that one existing customer had "transitioned development work from customized Iris+ product to unified Luminar Halo platform." The Halo platform, which the Company unveiled on April 23, 2024, was its purported "next-generation" LiDAR technology, which it claimed could "enable up to 4x the performance, is 3x smaller, boasts 2x the efficiency, and offers a 2x cost improvement over Iris." Defendants explained that "while Iris is successfully converting our vision for safety into reality, beginning with high-end vehicles, Luminar Halo is designed for mainstream adoption." Despite this positive spin, the reality was that Halo was in an earlier stage of development than Iris, and that Mercedes-Benz was thus transitioning from a "production" deal to a "development" deal, meaning actual sales and revenue were farther down the line.

34. While Defendants did not specify that the customer that had "transitioned" from Iris to Halo was Mercedes-Benz, analysts connected the dots. One analyst report reasoned that it must be Mercedes-Benz, noting that Hesai, a Chinese competitor to the Company, had announced that it had entered into a production agreement with a major European vehicle manufacturer, which was

reportedly Mercedes-Benz. However, Defendants did not disclose, and the market was not aware, that Mercedes-Benz terminated the agreement by reason of Luminar's failure to meet contractual requirements and thus breached the agreement.

35. Defendants stated that, as part of the Company's transition to focus on Halo, it "discontinued development of our Iris+ product, and essentially all our engineering and development efforts with customers are shifting to Luminar Halo. This narrowing of product scope is intended to further streamline our business model to drive efficient execution and reduce costs."

36. During the Company's November 11, 2024 earnings call for the third quarter of 2025, Defendant Russell falsely and misleadingly stated that "[w]e're scaling deliveries to our first production OEM [i.e., Volvo], meeting their key volume and quality requirements, and doing so at high yields."

37. However, former Luminar employees have revealed that the Company's Iris program, and its relationships with Volvo and Mercedes, were suffering from undisclosed problems throughout the Class Period.

38. FE-3[6] was a Senior Director of Business Development and Channel Sales from 2019 to fall 2025, reporting to Philip Hughes, Vice President of Business Development. FE-3 was tasked with pursuing non-automative customers such as

---

[6] Male pronouns are used to refer to all of the FEs in order to protect their identities and minimize the risk of retaliation.

manufacturers in agriculture, security, defense, construction, and mining. As a result, he was aware of the status of development of the Company's LiDAR sensors. According to FE-3, the sensors did not work reliably. Further, as a result of the design, the sensors could not be built at scale, but the Company did not modify the design to address this problem. FE-3 further reported that it cost Luminar approximately $1,800 to manufacture each Iris LiDAR device, which was far more expensive than what automotive customers were willing to pay, which was in the range of $500 to $1000 per unit. As a result, Luminar incurred losses on Iris sales, including its sales to Volvo.

39. FE-2 was a senior member of the engineering team working on Luminar's LiDAR sensors and worked at the Company from late 2022 until mid-2024. FE-2 oversaw the development of the Iris and Iris+ sensors. However, these sensors – even by the time of FE-2's departure in mid-2024 – "***never worked***." According to FE-2, this fact was well-known throughout the Company, and specifically by Defendant Russell, as it was discussed in meetings with Russell that FE-2 attended. FE-2 himself expressed numerous times in such meetings that the Company did not have a product that was ready. FE-2 further noted that the Company was organized around Russell's decisions and that there were no "checks and balances" around Russell.

40. FE-2 reported that these product failures were also known by Mercedes-Benz, which FE-2 knew because he regularly communicated with and met with Mercedes-Benz representatives regarding the status of the LiDAR sensors that the Company was developing for that customer. FE-2 attended weekly meetings with representatives of Mercedes-Benz and Nvidia, the chip company, which was tasked with incorporating Luminar's LiDAR sensors into Mercedes-Benz's driver assist system.[7] Russell usually attended these weekly meetings as well, in which problems with the LiDAR sensors were repeatedly discussed, including by Russell. FE-2 was responsible for helping to create reports about the status of the sensor development for these meetings with Mercedes-Benz and Nvidia, and stated that Russell pressured him to soften the portions describing problems or obstacles with the project.

41. FE-2 reported that the LiDAR product being developed for Mercedes-Benz was not functional and could not be mass produced. Further, there were many emails and reports from Nvidia identifying more than ten problems that required solving before the Company's LiDAR technology could be integrated into the

[7] Mercedes-Benz's partnership with Nvidia is confirmed by public statements issued by both of those companies. For instance, in June 2020, Mercedes-Benz announced that it and Nvidia "plan to enter into a cooperation to create a revolutionary in-vehicle computing system and AI computing infrastructure." And, in February 2023, the CEOs of Mercedes-Benz and Nvidia both attended an event in Silicon Valley where they discussed the partnership.

Mercedes-Benz driver assist system. However, the Company "had no roadmap" to fix these problems.

42. Puzzled as to why Mercedes-Benz would contract with the Company despite these problems, FE-2 suspected that the close relationship between Russell and the Chief Technology Officer of Mercedes-Benz, Markus Schäfer (or Schaefer), who was centrally involved in the relationship between the two companies, was at play. Indeed, Schäfer was replaced as CTO at Mercedes-Benz in September 2025, and almost immediately thereafter he and Russell co-founded a company called Russell AI Labs, which billed itself as a "platform that backs and builds transformative AI and frontier technology companies." In October 2025, Russell AI Labs made a bid to acquire the Company by purchasing all of its outstanding shares for an undisclosed price.

43. Subsequent events confirmed that the FEs correctly reported information that was hidden from investors. In September 2025, Volvo notified Luminar that, beginning in April 2026, it would offer the Company's Iris LiDAR technology only as an *option* on the EX90, as opposed to it being standard on vehicles. As a result, the expected number of Iris units that Volvo would purchase over the lifetime of the production deal was slashed by approximately ***90%***. Volvo also informed the Company that it would not be using *any* LiDAR, including Halo, in Volvo's next generation of vehicles. Given that the Iris technology was defective

and the Company was unable to produce them at scale, Volvo's decision was unsurprising.

44. In response to Volvo's decision, on October 3, 2025, the Company sent Volvo a notice claiming that *Volvo* had breached the FPA by failing to make sufficient purchases of Iris units.

45. Investors were not aware of these developments until October 31, 2025, when the Company filed a Form 8-K filed at approximately 8:30 am Eastern Time disclosing that

> The Company's largest customer, [Volvo], has informed us that, ***beginning in April 2026, Volvo will no longer make our Iris LiDAR standard on its EX90 and ES90 vehicles (although Iris will remain an option). Volvo also informed the Company that it has deferred the decision as to whether to include LiDAR, including Halo (Luminar's next generation LiDAR under development), in its next generation of vehicles from 2027 to 2029 at the earliest***. As a result of these actions, the Company has made a claim against Volvo for significant damages and has suspended further commitments of Iris LiDAR products for Volvo pending resolution of the dispute. The Company is in discussions with Volvo concerning the dispute; however, there can be no assurance that the dispute will be resolved favorably or at all. Furthermore, there can be no guarantee that any claim or litigation against Volvo will be successful or that the Company will be able to recover damages from Volvo.

46. As a result of the breakdown of its production deal with Volvo, the Company also disclosed that it had stopped paying its suppliers for the Iris LiDAR products encompassed by that deal, and had a notice of breach from the Company's principal supplier of Iris LiDAR sensors. This appeared to be Celestica LLC

("Celestica"), one of the Company's main suppliers, which, as Defendants later disclosed, sent the Company a letter on November 4, 2025, asserting over $41 million in claims for contract-related damages.

47. The October 31, 2025 announcement disclosed that as a result of the changes to the Company's Volvo partnership, (1) the Company was suspending its guidance for 2025, (2) the company had entered into forbearance agreements with the holders of the Company's Floating Rate Senior Secured Notes due 2028 (the "1L Notes") and 9.0% Convertible Second Lien Senior Secured Notes due 2030 and 11.5% Convertible Second Lien Senior Secured Notes due 2030 (collectively, the "2L Notes"), as the company had failed to make quarterly interest payments for the 2L Notes on October 15, 2025, (3) that "***substantial doubt exists about the Company's ability to continue as a going concern***," and (4) that, two days earlier, the Company committed to a plan, beginning immediately, to reduce its workforce by ***25%*** before the end of 2025.

48. The Company further disclosed on October 31, 2025 that Defendant Fennimore was stepping down, effective November 13, 2025, "to pursue other career opportunities," and that the Company had "recently received a subpoena from the SEC for documents in connection with an investigation the SEC is conducting to determine whether there has been a violation of federal securities laws."

49. The Company's stock price, already in the tank, fell ***45%*** from its $2.11 closing price on October 30, 2025, to close at $1.16 on October 31, 2025.

### C. As The Company Faced These Challenges, Russell Took His Private Jet Around The World, Often With Family In Tow, And Spent Company Money Extravagantly

50. During the Class Period, as the Company faced daunting operational and financial challenges, Russell's behavior was not that of a CEO laser-focused on the business. Defendants assured investors that they and the Company were committed to the Company's Code of Ethics, which they frequently touted, and told investors that Russell received no perquisites other than necessary personal security expenses. However, Russell took his private jet on trips "everywhere" (as one former Luminar employee put it), often with family members on board – though the Company was paying for these junkets. Even more egregiously, Russell had the Company spend millions on Formula One sponsorships and junkets, complete with parties on rented yachts. Russell's conduct, and the Company's acquiescence thereto, rendered misleading Defendants' statements about the Company's commitment to ethical conduct and about the "perquisites" that Russell received.

#### *1. Defendants Assured Investors That They, And The Company, Were Committed To The Company's Code of Ethics*

51. At the time of the SPAC business combination that brought the Company to the public markets, the Company assured investors that it was adopting a code of business conduct and ethics, which it posted on the investor relations

section of its website. Adopting a code of ethics was important to investors for two reasons. *First*, major stock exchanges, such as the Nasdaq, require listed companies to adopt ethics codes. *Second*, investors base investment decisions in part on the ethics and accountability of senior management, which is a key component of proper corporate governance. It is particularly important for newly-public companies that were previously not subject to stock exchange rules and the scrutiny applied to public companies.

52. The Company's Code of Ethics was adopted and approved on December 2, 2020, and became effective when the SPAC business combination closed that same day.

53. The Company specified that its Code of Ethics applied to all of its directors, employees, and officers, "***including our principal executive officer***, principal financial officer, principal accounting officer or controller, or persons performing similar functions," and "codifie[d] the business and ethical principles that govern all aspects of our business." Further, the Company assured investors that if it amended or waived certain provisions of its Code of Ethics, it would alert investors via an SEC filing. In addition, the Company assured investors that ***"[w]e are committed to active and responsible corporate citizenship***," which encompassed "business ethics."

54. The Code set forth detailed rules and principles that bound all directors,

officers, and employees, as well as independent contractors and consultants of the Company. Per the Code, the Company was "committed to promoting an environment where compliance with applicable laws and regulations is expected and ethical behavior is the norm." The Code stated that "***[a]ll*** directors, officers and employees of the Company are ***required*** to be familiar with this Code, ***comply*** with its provisions, and ***report*** any suspected violations." Further, "***officers***, managers, and other supervisors are expected to develop a sense of commitment in employees to the spirit and the letter of the Code," and "[m]anagers and supervisors are also expected to require all agents, consultants and contractors working with or on behalf of Luminar to conform to the standards set forth herein."

55. The Code makes clear that "***[e]mployees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships***," and specifies that "***[c]onflicts of interest also arise when an employee, officer or director (or a family member) receives improper personal benefits as a result of his or her position in the Company***." It further requires that "[e]xecutive officers must ***seek*** determinations and prior authorizations or approvals of potential conflicts of interest exclusively from the General Counsel."

56. The Code further emphasizes that:

> All directors, officers and employees should protect the Company's assets and ensure their reasonable and efficient use. ***Theft, carelessness, and waste have a direct impact on the Company's profitability and are prohibited***. ***All Company assets should be used***

> ***only for legitimate business purposes, though incidental personal use is permitted.***
>
> All directors, officers and employees owe a duty to the Company to advance its legitimate interests. Directors, officers and employees are prohibited from taking for themselves personally (or for the benefit of friends or family members) opportunities that are discovered through the use of Company assets, property, information or position. ***Directors, officers and employees may not use Company assets, property, information or position for personal gain (including gain for friends or family members).*** In addition, no director, officer or employee may compete with the Company.

57. In addition, the Code provides that:

> Luminar is committed to promoting fair and transparent business decisions and protecting its reputation. Modest gifts, meals, and entertainment of a reasonable and normal value are often used to strengthen business relationships. ***However, employees should not give or receive anything that might improperly influence, or give the appearance of improperly influencing, a business decision or good judgment.*** In addition, employees may not accept loans or favors from a customer, supplier, or third party. ***These actions may compromise, or appear to compromise, your ability to make fair business decisions***.

58. The Code contains several provisions addressing "the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC." It provides that "***directors must***[] . . . raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed[.]" It further states that "the Board ***requires that the Chief Executive Officer*** and senior personnel in the Company's finance department ***adhere to the following ethical principles and accept the obligation to foster a culture***

***throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.***" It continues:

> Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Vice President of Finance, Corporate Controller, and any other persons performing similar functions ("Senior Financial Employees"):
>
> - ***Act with honesty and integrity and use due care and diligence in performing their responsibilities to the Company***.
> - ***Avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company, and disclose promptly to the Audit Committee, any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict***. . . .
>
> . . .
>
> - ***Comply with applicable laws, rules, and regulations of federal, state and local governments,*** and of any applicable public or private regulatory and listing authorities.
> - ***Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee***.

59. Thus, Luminar's Code of Ethics, inter alia, (1) prohibited "theft, carelessness, and waste" and required "responsible use of and control over all assets and resources entrusted to each Senior Financial Employee," including the CEO, (2) prohibited all employees from using his or her position at the Company from obtaining "improper personal benefits" for themselves or family members, (3) prohibited employees from giving any gifts "that might improperly influence, or give the appearance of improperly influencing, a business decision," including giving

gifts to customers, and (4) required senior management, in particular, to be aware of the rules contained in the Code, to comply with it, and to report any suspected violations.

60. Further, the Code provided that violations of the Code would be investigated, and that

> If the investigation indicates that a violation of this Code has probably occurred, the Company will take such action as it believes to be appropriate under the circumstances. ***If the Company determines that an employee is responsible for a Code violation, the employee will be subject to disciplinary action up to, and including, termination of employment for cause and, in appropriate cases, civil action or referral for criminal prosecution***. Appropriate action may also be taken to deter any future Code violations.

61. Moreover, Defendants assured investors that the Company was "***committed to active and responsible corporate citizenship***," which encompassed "business ethics," and was also "***committed*** to promoting an environment where compliance with applicable laws and regulations is expected and ethical behavior is the norm."

*2. SEC Rules Require Disclosure Of Perquisites To Executive Officers*

62. The SEC has promulgated binding disclosure requirements for executive and director compensation. In addition to salary, bonus, stock awards, option awards, and specified other categories, registered issuers must disclose "All other compensation." This must include, *inter alia*, "[p]erquisites and other personal

benefits, or property, unless the aggregate amount of such compensation is less than $10,000." 17 CFR § 229.402(c)(2)(ix)(A). The Instructions to Item 402 of Regulation S-K mandate as follows:

> ***If the total value of all perquisites and personal benefits is $10,000 or more for any named executive officer, then each perquisite or personal benefits, regardless of its amount, must be identified by type***. If perquisites and personal benefits are required to be reported for a named executive officer pursuant to this rule, then each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that officer must be quantified and disclosed in a footnote. The requirements for identification and quantification apply only to compensation for the last fiscal year. Perquisites and other personal benefits shall be valued on the basis of the aggregate incremental cost to the registrant. With respect to the perquisite or other personal benefit for which footnote quantification is required, the registrant shall describe in the footnote its methodology for computing the aggregate incremental cost. Reimbursements of taxes owed with respect to perquisites or other personal benefits must be included in column (i) and are subject to separate quantification and identification as tax reimbursements (paragraph (c)(2)(ix)(B) of this Item) even if the associated perquisites or other personal benefits are not required to be included because the total amount of all perquisites or personal benefits for an individual named executive officer is less than $10,000 or are required to be identified but are not required to be separately quantified.

17 CFR § 229.402(c)(2)(ix).

*3. Defendants Represented That Russell Received Zero Perquisites In 2021 Through 2023, And That Subsequent Perquisites Were Limited to Personal Security Expenses*

63. Despite these requirements, Defendants represented throughout the Class Period that:

> We provide benefits to our named executive officers on the same basis as provided to all of our employees, including health, dental and vision insurance; life insurance; accidental death and dismemberment insurance; critical illness; short- and long-term disability insurance; a health reimbursement account; a health savings account; a flexible spending account; and a tax-qualified Section 401(k) plan for which no employer match is provided. ***We do not maintain any executive-specific benefit or perquisite programs.***

64. Further, the Company's Forms 10-K and proxy statements issued during the Class Period did not disclose that the Company paid for private air travel for Russell and members of his family.

65. The Company's 2021 10-K, in its Summary Compensation Table, stated that Russell received zero for "All Other Compensation" in 2021. The Company's proxy statement filed in preliminary form on April 14, 2023 and in final form on April 28, 2023 (the "2023 Proxy Statement") (which was incorporated by reference in the 2022 10-K, filed on February 28, 2023), stated the same for 2022.

66. The following year, in the proxy statement filed in preliminary form on April 14, 2024, and in final form on April 25, 2024 (the "2024 Proxy Statement") (which was incorporated by reference in the 2023 10-K filed February 28, 2024), the Company restated Russell's "All Other Compensation" for 2022, revising it from zero to *$477,017*. However, it stated that this merely "represents the incremental cost to the Company of certain personal security measures. Such personal security costs for Mr. Russell during 2022 were not previously classified as perquisites by the Company. We have updated the amount reported for perquisites for 2022 to include

such costs," which were valued at "the actual cost to us of the personal security expenses."

67. The 2024 Proxy Statement reported $734,499 in "All Other Compensation" to Russell in 2023, and again represented that was the actual cost of Russell's personal security protection.

68. The 2024 10-K reported $497,253 in "All Other Compensation" to Russell in 2024, and again represented that this was the actual cost of Russell's personal security protection.

*4. Russell Received Improper And Misrepresented Perquisites, Including for Family Members, and Spent Company Funds Extravagantly in Violation of the Code of Ethics*

69. Per multiple former employees, and unbeknownst to investors, during the Class Period, Defendant Russell habitually used Company resources to improperly benefit himself and his family, including in the form of excessively luxurious travel and accommodations, and charging yacht rentals to the Company's books. These actions violated the Company's Code of Ethics, contradicting Defendants' touted "commitment" to ethics and posing a material risk to the Company's relationships with key customers (Mercedes-Benz and Volvo, in particular) and to Russell's role in the Company. Indeed, as discussed further below, Russell abruptly left the Company on May 14, 2025, effectively immediately, following an internal investigation into violations of the Code of Ethics.

70. FE-1 was employed as a Senior Analyst in the accounting function at Luminar from January 2025 to summer 2025, and was based at Luminar's Orlando headquarters. As a result of his responsibilities, FE-1 had access to the Company's general ledger and other financial reports, which showed the Company's expenses in various categories. FE-1 understood that, at Russell's direction, the Company incurred expenses $7 or 8 million for a trip to Monaco at the time of the Monaco Grand Prix, which involved expensive parties and accommodations, including a yacht rental. According to FE-1, the internal "spin" was that the expenses were for a sponsorship with Formula One, but the sponsorship merely involved a plan to integrate Luminar's LiDAR technology into the official Formula One safety car at some point in the future. Luminar's "sponsorship" was for the 2024 Monaco Grand Prix, which took place on May 26, 2024.

71. FE-1 characterized the level of corporate spending, including by executives, as "insane." Executives spent lavishly on travel and meals. For instance, executives attended a convention in Las Vegas in 2023, racking up several million dollars in expenses, even though the Company was not a sponsor of the event. Further, the Company had a production facility in Thailand and some executives,

when visiting, stayed in Thailand for a full month.[8] FE-1 reported that the general ledger showed over ***$100 million*** in travel expenses for 2024.

72. FE-3 had also heard about Luminar's excessive spending to "sponsor" Formula One, stating that he heard that the Company spent $10 million to $15 million on this project, yet nothing came of it.

73. FE-2 confirmed that Russell incurred massive amounts of travel expenses and exclusively flew on private jets. Indeed, when FE-2 joined the Company, Russell invited him to fly on a private jet from California to Florida for FE-2's first day. Defendants Russell and Fennimore, as well as other executives, were on the flight, as well as Russell's parents, which FE-2 described as "weird."

74. FE-3 corroborated these reports, stating that Russell "flew his private jet everywhere," and heard that Russell charged the jet to Luminar. Indeed, he heard that, even when Luminar's financial and operational problems forced it to begin laying off significant numbers of employees, Russell refused to give up his private jet.

75. FE-4 was an executive assistant at the Company from mid-2021 to early 2024, supporting several executives, including Eichenholz, the co-founder, and was

---

[8] According to Luminar's SEC filings, the Company launched its Iris LiDAR into production in the third quarter of 2022, working with, *inter alia*, a third-party manufacturer in Thailand; built out and brought up an optical sub-assembly line in Thailand with Fabrinet, a third-party contract manufacturer, in 2023; and intended to bring a high-volume production line live in Thailand by the end of 2025.

involved in processing expenses for Defendant Russell, including early in his tenure at the Company. When FE-4 saw how costly the travel and meals that Russell charged to the Company were, he was shocked: "my jaw would drop." Per FE-4, Russell refused to fly on commercial planes after the beginning of the COVID-19 pandemic, and thus only few on private jets, which he charged to the Company.

76. According to FE-4, Russell stayed at expensive hotels as a matter of course, getting penthouse suites costing $7,500 per night or more. For instance, Russell stayed for five nights at The Beverly Hills Hotel and Bungalows from April 7 to 11, 2021, at a nightly rate of ***$15,000***. The total bill, including meals, laundry/dry cleaning, parking and valet services, and tax, exceeded $73,000. The entire bill was submitted into Luminar's expense reporting system.

77. Two months later, Russell stayed at the Equinox Hotel in New York City from June 11 to 17, 2021. The daily room charge was $1,725, and the bill totaled nearly $15,000 including meals, valet fees, and other charges.

78. Russell also had a two-night reservation at the Intercontinental Boston from June 16 to 18, 2021, which cost a total of approximately $1900. This reservation overlapped by one night with the Equinox reservation; Russell commonly had this done so that his security detail could arrive the day before he did with his clothes and other personal effects. Like the Beverly Hills Bungalows expenses, the Equinox and Intercontinental Boston bills were submitted to the

Company's expense reporting system.

79. For a company event in Colorado Springs, Colorado (the location of Black Forest Engineering, which the Company acquired in 2018), Russell insisted on renting a whole house for himself, a family member, and his security team, at a cost of $6,900 per night, for three nights.

80. For another example, Russell and other executives took a chartered flight to China during FE-4's tenure, which cost approximately ***$600,000***. FE4 was dismayed and surprised that Russell was permitted to spend Company money so lavishly. By contrast, FE-4 noted, Eichenholz – the Company's co-founder – was far more diligent and responsible with regard to his own corporate expenses, even going so far as to pay for some flights himself in order to save the Company money.

81. Despite these hidden facts, Defendants represented that Russell's perquisites were merely for necessary personal security measures and that the Company was committed to its Code of Ethics.

82. The Company's payment for or reimbursement of Russell's family members' travel expenses violated several provisions of the Company's Code of Business Conduct and Ethics. *First*, they violated the provision that "[a]ll Company assets should be used only for legitimate business purposes," as travel for Russell's family members is not a "legitimate business purpose." While this provision permits "incidental personal use," travel by Russell's family members does not constitute

Russell's personal use and therefore is not permitted. *Second*, they violated the prohibition on "theft, carelessness, and waste" and the requirement for "responsible use of and control over all assets and resources entrusted to each Senior Financial Employee." *Third*, they violated the provision that "[d]irectors, officers and employees may not use Company assets, property, information or position for personal gain (including gain for friends or family members)." The Company's payment for or reimbursement of Russell's family members' travel – rendering their travel free or discounted – constituted Russell's "personal gain," as that explicitly includes "gain for friends or family members" of Russell's.

83. FE-5 further corroborated these reports. FE-5 was an executive assistant at Luminar from before the Class Period until autumn of 2024, and was directly involved in arranging travel for Russell before those duties were assigned to Adele Heydenrich, who was employed by Russell personally, rather than the Company, as Russell's Personal Chief of Staff and Family Office Manager. FE-5 also reported (corroborating FE-2) that Russell was close to Mercedes-Benz CTO Markus Schäfer and that the two attended parties together, including at Formula One events. FE-5 confirmed that Russell rented a yacht during the Monaco Grand Prix, and stated that this was charged to the Company. FE-5 heard that there was another yacht rental by Russell after FE-5 left the Company.

84. FE-2 also heard that both Russell and Schäfer attended the Monaco Grand Prix when Luminar sponsored it, and that they had rented a yacht for a party.

85. Russell's use of Company resources in this manner also violated the Code of Ethics. *First*, they violated the provision that "[a]ll Company assets should be used only for legitimate business purposes," which permitted only "incidental personal use." *Second*, they violated the prohibition on "theft, carelessness, and waste" and the requirement for "responsible use of and control over all assets and resources entrusted to each Senior Financial Employee." *Third*, Russell's use of Company assets to throw lavish yacht parties for customers such as Mercedes-Benz's CTO violated the prohibition on "giv[ing] or receiv[ing] anything that might improperly influence, or give the appearance of improperly influencing, a business decision or good judgment," as the Code permitted only "*[m]odest* gifts, meals, and entertainment of a *reasonable and normal value*."

86. The fact that the Company's CEO repeatedly violated the Code of Ethics – including through actions that implicated relationships with key customers – was not disclosed to investors, who were misled by Defendants' statements touting the importance of, and the Company's commitment to, the Code of Ethics. Further, Russell's violations of the Code created a heightened risk that he would be subject to adverse employment repercussions under the Code, up to and including termination, with negative implications for the Company's stability and governance.

### D. <u>In 2024, The Company Began Investigating Defendant Russell, Leading to His Sudden Departure</u>

87. Though permitted for years, certain Company insiders eventually began an investigation into Defendant Russell's conduct, leading to his sudden departure on May 14, 2025.

88. According to FE-1, when Sameer Ladiwala, the Company's Chief Accounting Officer since 2021, resigned in mid-2024, the Company assigned the Vice President of Internal Audit and IT to oversee accounting. This was an individual named Nipon Malhotra. In the second or third quarter of 2024, an internal investigation into Russell's spending began; Malhotra supported the investigation, as FE-1 knew because he received information directly from Malhotra about the investigation. FE-1 believed that one subject of the inquiry was the $7 or 8 million in expenses for the Monaco Grand Prix trip

89. This information is corroborated by a complaint filed on August 13, 2025, in California state court, by Russell's former employee Adele Heydenrich. In her complaint, Heydenrich referred to a discussion she had in or around August 2024 with Alan Prescott, the Company's Chief of Legal from April 2021 to December 2024. During that discussion, Heydenrich referred to an investigation into Russell being conducted by "the Sidley Law Firm," presumably referring to Sidley Austin LLP. (Indeed, Sidley Austin is identified as counsel to Luminar's Board of Directors in filings in Luminar's bankruptcy proceeding.)

90. Thus, at least as early as August 2024, the Company had begun an internal investigation into Russell, covering at least his improper expenses. This was not disclosed to investors, even though the Company had previously recognized in SEC filings that "[w]e are highly dependent on the services of Austin Russell, our Founder, President and Chief Executive Officer."

91. That investigation continued until 2025, and on May 14, 2025, the Company surprised investors by announcing that Russell was stepping down from the Company he led and co-founded, effectively immediately. He did not even attend the earnings call taking place that same evening.

92. This shocking development also contributed to the breakdown of the Company's partnership with Volvo, as it showed the instability of the Company's senior management ranks (further illustrated by Defendant Fennimore's departure at the end of the Class Period) and suggested a lack of judgment.

### E. <u>Following the Class Period, the Company Filed for Bankruptcy</u>

93. By the end of the Class Period, the Company was in freefall, with both customers and creditors highly uncertain that the Company would be able to continue operating. The Company had already begun exploring strategic alternatives months earlier. In January 2025, it retained Jefferies LLC ("Jefferies") to respond to an unsolicited acquisition proposal and consider other strategic alternatives, though this did not lead to any transaction.

94. In September 2025, Jefferies initiated a process to explore a potential business combination for the Company or part thereof. That same month, the Company began to explore options for a comprehensive restructuring solution and engaged Weil, Gotshal & Manges LLP ("Weil") and Triple P TRS, LLC ("Portage Point") to assist with those efforts along with Jefferies. In October 2025, the Company expanded the scope of Jefferies' engagement to include the exploration of various restructuring alternatives, including a divestiture of the Company's semiconductor business, Luminar Semiconductor, Inc. ("LSI"), and its subsidiaries (collectively, "LSICo").

95. On October 14, 2025, Russell AI Labs made a non-binding proposal to acquire the Company and combine it with an unnamed global automotive technology company. According to the Company, the Russell AI Labs proposal involved "substantial execution risk."

96. On October 31, 2025, a third-party, Quantum Computing, Inc. ("QCi") submitted an indication of interest to acquire the equity of LSICo on an out-of-court basis for $100 million. On November 2, 2025, in exchange for QCi raising its purchase price to $110 million, the Company and QCi entered into an exclusivity agreement with a November 14, 2025 deadline. However, Luminar and QCi were unable to enter into a binding agreement by the deadline. As a result, the Company terminated the exclusivity agreement and continued marketing LSICo while still

negotiating and trying to execute a binding definitive agreement with QCi, as well as continuing to negotiate with its noteholders.

97. Eventually, the Company and QCi entered into an agreement whereby Luminar would file for bankruptcy under Chapter 11 of the Bankruptcy Code, while keeping LSICo out of bankruptcy, and QCi would make a stalking horse bid for LSICo in the Chapter 11 proceeding. Luminar filed a Chapter 11 petition on December 15, 2025. The Chapter 11 case is proceeding, but one thing is clear: stockholders will be wiped out entirely.

## V. DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS

### A. Defendants' Misrepresentations Regarding Luminar's LiDAR Technology and Customer Relationships

98. On April 23, 2024, at its annual Investor Day, Defendant Russell stated

> Over the years, Luminar has invested around $1.8 billion to be able to develop the leading technology foundation for our industry. And this is something that is composed of a lot of different areas here of what's required to be able to successfully deliver into a production environment to meet these specifications and requirements to be able to set up the foundation for success for future technologies and products and the broader ecosystem. So everything from the LiDAR engineering to Luminar semiconductor, to software systems, to industrialization, to our IP leadership position, to industrializing our supply chain to be automotive grade, to global OEM standards, there's a lot of stuff that has to go into that. And frankly, there's no way you're doing half of this stuff without investing at least $1 billion to successfully be able to develop this. ***So the important point here, though, is that Luminar has made the investments that it needed to make***. ***Now, for the first time, we get to ride the tailwinds of this investment to be able to successfully scale with our business, introduce these new technologies that we've invested previously to be able to develop and, at the same time, be able***

> ***to substantially reduce costs overall for the business on an ongoing basis as a result of the fundamental technology platform that we've created***.

99. The statements above were materially false and misleading because they represented that Luminar was ready for full-scale production of its LiDAR technology, when in fact that technology was defective and, due to its design, could not be manufactured at scale.

100. On August 6, 2024, during the Company's earnings call for the second quarter of 2024, Defendant Russell stated that "***We've since successfully ramped our production to meet all key Volvo deliverables*** and we're looking forward to seeing them continue to scale."

101. The statements above were materially false and misleading because they represented that Luminar was ready for full-scale production of its LiDAR technology, when in fact that technology was defective and, due to its design, could not be manufactured at scale.

102. During the Company's November 11, 2024 earnings call for the third quarter of 2025, Defendant Russell stated: "We're scaling deliveries to our first production OEM [i.e., Volvo], meeting their key volume and quality requirements, and doing so at high yields."

103. The statements above were materially false and misleading because they represented that Luminar was ready for full-scale production of its LiDAR

technology, when in fact that technology was defective and, due to its design, could not be manufactured at scale.

104. On March 20, 2025, in a press release (which quoted Defendant Russell) and presentation (entitled "Q4'24 Business Update") attached to a Form 8-K signed by Defendant Fennimore, Defendants issued financial guidance for Luminar for 2025, guiding as follows: (i) year-over-year revenue growth of 10-20% (i.e., $82.9345 million to $90.474 million, based on 2024 revenue of $75.395 million); (i) shipping 30,000 to 33,000 LiDAR sensor units to customers for series production; and (iii) gross losses averaging $5-10 million per quarter.

105. On May 14, 2025, Defendants reiterated this guidance, revising only Luminar's operating expenses (OpEx) targets. This affirmation of the previous guidance was delivered in press release regarding the Company's financial results for the first quarter of 2025 (the "1Q25 Press Release"), which quoted Defendant Russell and was filed as an attachment to a Form 8-K signed by Defendant Fennimore and filed before Russell's departure was announced. The 1Q25 Press Release "provided a status update on the following business milestones to be achieved by year-end 2025," and stated that the Company was "[o]n track" to "[r]amp series production volume at least 3x year-over-year" (consistent with the previous guidance of shipping 30,000-33,000 LiDAR sensor units to customers). The same Form 8-K also attached a presentation entitled "Operating Plan, Go-

Forward Strategy & Q1'25 Business Update" that stated that the Company was "Reiterating FY'25 Financial Guidance with Lower OpEx Targets," and that the Company maintained its revenue guidance, and "still assume[d] FY'25 sensor shipments of 30k-33k." The 1Q25 Press Release and presentation both reported that Luminar had shipped "~6k" LiDAR units to customers in the first quarter of 2025, meaning that the Company would ship another 24,000 to 27,000 during the rest of the year.

106. On August 12, 2025, Defendants revised the Company's guidance for 2025, lowering projected sensor shipments to 20,000 to 23,000 (down approximately ***one-third*** from the prior guidance of 30,000 to 33,000), and revised its revenue guidance down to "$67 million to $74 million due to lower shipment assumption and lower revenue associated with the winding-down of non-core data contract (down from implied range of $82 million to $90 million previously)." This represented an ***18.7%*** reduction in revenue guidance at the midpoint. Defendants projected Q3 revenue of $17-19 million; based on the midpoint ($18 million), this meant that the Company was projecting Q4 revenues of $14.4772 million to $21.477 million). Defendants also stated that they expected that gross losses in 2025 would likely be towards the higher end of the previously-given guidance of a $5-10 million quarterly average. Defendants reported on this date that the Company had shipped "*roughly* 5,000 Iris sensors during the quarter . . . , with the vast majority of these shipments

going to Volvo." (The Company later disclosed that it shipped 4,800 sensors in the second quarter.) Thus, Defendants represented that the Company was still going to ship another 9,000 to 12,000 units during the second half of the year.

107. These guidance statements were false and misleading because they represented that Luminar was ready for full-scale production of its LiDAR technology, could constrain its losses as it satisfied customer orders and requirements, and increase its revenues in Q4 (up to $21.477 million). However, the Company's LiDAR technology was defective and, due to its design, could not be manufactured at scale. As noted above, the Company suspended its 2025 guidance on October 31, 2025. As the Company disclosed after the Class Period that it had shipped 5,400 Iris sensors in the third quarter, with the "vast majority" again going to Volvo, the Company thus only shipped a total of approximately 16,200 Iris LiDAR sensors in 2025 – approximately ***50% less*** than Defendants' initial guidance and ***25% less*** than the lowered guidance given on August 12, 2025.

### B. Defendants' Misrepresentations Regarding Russell's Compensation and Perquisites

108. The Company's 2021 10-K (filed March 1, 2022), 2023 Proxy Statement (filed in preliminary form on April 14, 2023 and in final form on April 28, 2023, and incorporated by reference in the 2022 10-K), 2024 Proxy Statement (filed on April 25, 2024, and incorporated by reference in the 2023 10-K filed February 28, 2024), and 2024 10-K (filed March 28, 2025) all represented that

> We provide benefits to our named executive officers on the same basis as provided to all of our employees, including health, dental and vision insurance; life insurance; accidental death and dismemberment insurance; critical illness; short- and long-term disability insurance; a health reimbursement account; a health savings account; a flexible spending account; and a tax-qualified Section 401(k) plan for which no employer match is provided. ***We do not maintain any executive-specific benefit or perquisite programs***.

109. In addition, each of these filings included a Summary Compensation Table that reported "All Other Compensation" for Russell, which under SEC rules includes perquisites, and represented that such compensation solely represented the actual cost to the Company of "necessary" personal security measures.

110. These statements were false and misleading because: (1) Russell's "All Other Compensation" did not only represent necessary "personal security measures," but included material amounts of excessive travel expenses for Russell and for Russell's family members, and were not necessary as a security measure; (2) the Company did not quantify and disclose all of Russell's perquisites, including travel expenses for Russell's family members, in a footnote; (3) the material amounts of travel expenses for Russell's family members violated the Company's Code of Business Conduct and Ethics and should not have been reimbursed and thus should not have been included in "All Other Compensation;" and (4) Russell received more than "zero" in perquisites in 2021 and 2022.

111. These misstatements were material to investors because they implicated the Company's founder and CEO and created a material, undisclosed risk that

Russell's receipt of improper perquisites could lead to adverse employment consequences, up to and including termination, as it in fact did. The Company's own SEC filings represented that it was "highly dependent" on Russell, confirming the materiality of Defendants' misstatements concerning his compensation.

### C. Defendants' Misrepresentations Regarding Their, and the Company's, Commitment to Ethics

112. During the Class Period, Defendants made materially false and misleading statements regarding the Company's commitment to and enforcement of its Code of Ethics.

113. In the 2022 10-K, the 2023 10-K, the 2024 10-K (as originally filed and as amended on the 2024 10-K/A), the 2023 Proxy Statement, and the 2024 Proxy Statement, Defendants stated that:

> We have adopted a Code of Business Conduct and Ethics that applies to all of the members of our board of directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. Our Code of Business Conduct and Ethics is posted on the Investor Relations section of our website, which is located at https://investors.luminartech.com by clicking on "Governance Documents" in the "Governance" section of our website. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our Code of Business Conduct and Ethics by posting such information on our website at the location specified above.

114. Thus, each of these filings directed investors to the Code on the Investor Relations section of the Company's website, where it appeared throughout the Class

Period. As set forth above (§ IV.C.4), Russell's spending violated multiple provisions of the Code of Ethics. The Company's filings touting the Code of Ethics falsely and misleadingly represented that the Company's Code of Ethics "applie[d]" to Russell, that any "waiver" of any provision of the Code would be disclosed, and that violations of the Code would be investigated and that "[i]f the Company determines that an employee is responsible for a Code violation, the employee ***will*** be subject to disciplinary action up to, and including, termination of employment for cause and, in appropriate cases, civil action or referral for criminal prosecution." In truth, the Code was not applied to Russell, was effectively waived as to Russell (who resigned and was not terminated for cause), and the Company did not initiate any investigation of Russell until Q2 or Q2 2024, despite Code violations beginning in 2021.

115. In addition, the 2022 10-K, the 2023 10-K, and the 2024 10-K each stated that:

> ***We are committed to active and responsible corporate citizenship. Our Corporate Social Responsibility ("CSR") program*** is divided into seven elements (diversity and inclusion; human resources; finance/accounting; responsible sourcing; environmental, health and safety; trade compliance; ***and business ethics***), each spearheaded by company leaders and subject matter experts in their respective areas.

116. These statements falsely and misleadingly stated that the Company was "committed" to CSR, specifically including "business ethics," despite Russell's

excessive perquisites (including for the travel and accommodations of family members) and spending in violation of the Code.

117. In addition, on May 14, 2025, at approximately 5:11 pm Eastern Time, the Company filed a Form 8-K, signed by Defendant Fennimore, attaching the 1Q25 Press Release. The 1Q25 Press Release quoted Defendant Russell as follows:

> "In a world of macro uncertainty and adversity, we're firing on all cylinders to ramp up production, ramp down costs, and capitalize on the future, as evidenced by our announcements today," said Austin Russell, Founder & CEO. "This kicks off our new operating plan for Luminar with a unified product platform, enabling radical focus and streamlining of the business, as well as unlocking value throughout our organization."

118. This statement was false and misleading because it purported to describe the Company's current condition and recent developments, and referred to Russell as the Company's CEO, without disclosing that Russell had stepped down or was imminently stepping down within a matter of minutes.

## VI. <u>LOSS CAUSATION</u>

119. On March 20, 2025, after market close, Luminar filed a Form 8-K attaching a press release reporting results for the fourth quarter of 2024 (the "4Q24 Press Release") as well as a quarterly business update presentation (the "March 20, 2025 Presentation") and held an earnings call (the "4Q24 Earnings Call").

120. With respect to Volvo, the March 20, 2025 Presentation also disclosed that the Company had "planned production downtime in Q4 [of 2024] to reduce

inventory levels and align with lead customer's [i.e., Volvo's] production rate." Thus, the Company disclosed that the production rate for Volvo vehicles including the Company's Iris LiDAR technology had been reduced.

121. The March 20, 2025 Presentation also reported that one "OEM and Luminar decided to transition development work from customized Iris+ product to unified Luminar Halo platform," meaning that a *production* contract was ended and replaced, instead, by a *development* contract, which is an earlier stage and thus farther from actual start of production. Further, the March 20, 2025 Presentation disclosed that "Iris+ eliminated from Luminar product family and will no longer serve as bridge product from Iris to Luminar Halo" as the Company focused its strategy on Halo. Again, because Halo was in an earlier stage of product development, this meant a longer period until the Company might see significant sales and revenue. Indeed, the presentation disclosed that "our forward-looking order book as of 2024 would be *lower* relative to 2023."

122. Analysts took note. For instance, Goldman Sachs said the news was "an incremental negative," noting that

> while Luminar said it has not lost any customers, we see a reduced medium term opportunity, including at Mercedes, when considering the following points in combination: 1) Luminar has shifted a prior Iris+ series production award to a development contract for Halo (***we believe this was for Mercedes given the timeframes Luminar had spoken of for Iris+ and Mercedes***); 2) Luminar said its forward looking order book would have been revised down from last year given the shift to Halo under development contract(s) rather than series production

> awards (although, similar to peers, Luminar will not disclose this metric in the future); 3) Hesai has announced a global win with a top European OEM and Reuters reported that this customer is Mercedes; 4) ***A muted ramp at least so far with Volvo***.

123. The Company's stock fell as the market digested the news, which took time given the "mixed" information, as Goldman characterized. Indeed, the Goldman Sachs analyst report referenced in the paragraph referenced was not published until March 24, 2025. The stock rose temporarily on March 21, 2025, closing at $8.35, above the March 20 closing price of $6.28 per share, before falling to $6.41 on March 24 (the next trading day), beginning a substantial downturn. By the close of March 28, 2025, the stock had fallen to $6.015 per share.

124. On March 28, 2025, after market hours, the Company filed its 2024 10-K, which disclosed, with respect to Volvo, that "Our LiDAR sensors on initial vehicles are first being used for road data collection and system training, and will later be activated as part of the vehicle's active safety system." Thus, the Company's Iris LiDAR would not be activated for driver assist or safety features at the outset, a lesser role than the Company had given investors to believe and further revealing that Iris was not ready for full-scale production and use.

125. The Company's stock price fell 10.3% from its March 28, 2025 closing price, to close at $5.39 on the next trading day, March 31, 2025. It continued falling for the next three trading days, closing at $5.00 on April 3, 2025.

126. On May 14, 2025, after market hours, at approximately 5:37 pm Eastern Time (i.e., 26 minutes after the Company issued the 1Q25 Press Release), the Company issued a press release announcing that Defendant Russell had resigned as President and CEO of the Company and as the Chairman of the Board, "effective immediately, following a Code of Business Conduct and Ethics inquiry by the Audit Committee of the Board of Directors." The press release announced that the Company's Board had appointed Paul Ricci, an advisor to venture capital firm Lightspeed Venture Partners, as the Company's new CEO, effective on or about May 21, 2025, and had approved Ricci's appointment as a member of the Board, effective as of the beginning of his employment as CEO. The press release disclosed that Fennimore would serve as interim principal executive officer until Ricci's start date.[9] The press release also quoted Board member Matt Simoncini as stating excitement about Ricci's appointment and praising Ricci's competence and accomplishments.

127. In response to this news, the Company's stock price fell $0.80 per share, or 16.80%, to close at $3.96 per share on May 15, 2025. Multiple analysts tied the stock drop to Russell's departure.

128. A J.P. Morgan analyst report began:

> ***We are moving to Neutral from Overweight following the announcement of Founder and CEO, Austin Russell, stepping down effective immediately,*** following a Code of Business Conduct and Ethics inquiry by the Audit Committee of Luminar's Board of

[9] Mr. Ricci's employment did not begin until May 27, 2025.

> Directors. ***We believe Austin's leadership in technology and his industry reputation were central to the bull thesis for the company*** (for us and the investors we engage with), and while the company retains a strong talent bench and a robust product portfolio, including a best-in-class and vertically integrated technology stack, the ***uncertainty surrounding technology leadership***, the conversion of commercial negotiations, and the overall long-term roadmap leads us to adopt a more cautious stance, especially in the context of a choppy auto industry backdrop due to tariff uncertainty.

129. Echoing this, when Bank of America announced that it was terminating its analyst coverage of Luminar on May 21, 2025, it stated that "The recent departure of [Luminar's] CEO and founder, Austin Russell, could also adversely impact its ability to innovate."

130. On October 31, 2025, at approximately 8:30 am Eastern Time, the Company filed Form 8-K filed disclosing the facts set forth in paragraphs 45-48 above. The Company's stock price fell ***45%*** from its $2.11 closing price on October 30, 2025, to close at $1.16 on October 31, 2025.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

131. A strong inference that Defendants were at least reckless as to the possibility of misleading investors is established by the allegations above as well as those set forth below.

132. *First*, Russell himself signed and/or approved all of the Forms 10-K, Forms 8-K, and proxy statements referenced herein and issued during the Class

Period until his sudden departure on May 14, 2025. Thus, he was aware of the undisclosed facts concerning his own perquisites and excessive spending.

133. *Second*, the Code of Ethics required both Russell and Fennimore to familiar with its contents, comply with it, and report any suspected violations thereof, and Russell and Fennimore each signed and certified numerous SEC filings touting the Company's Code of Ethics and their commitment thereto.

134. *Third*, numerous former employees with various responsibilities were aware of Russell's excessive perquisites and spending, indicating that it was common knowledge at the Company.

135. *Fourth*, Russell and Fennimore repeatedly spoke in detail to investors and analysts about the status of the Company's LiDAR technology programs and relationships with key customers, including Volvo and Mercedes-Benz, during the Class Period, showing that they were knowledgeable about these matters and thus aware of the facts hidden from investors.

136. In addition, a strong inference of Defendants' scienter with respect to Defendants' misstatements in the 1Q25 Press Release is further strengthened by the fact that the 1Q25 Press Release, which quoted Defendant Russell and was filed as an attachment to a Form 8-K signed by Defendant Fennimore, and disclosed that

> The Company expects to file a notification of late filing on Form 12b-25 with the SEC, which will provide an automatic 5-day extension of the filing deadline for its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2025 (the "Quarterly Report"), to

> May 20, 2025. The Company expects to file the Quarterly Report as soon as practicable within the 5-day extension period.

137. As the Company acknowledged just two days later, on May 16, 2025, the reason the Company was unable to timely file its Form 10-Q for the first quarter of 2025 was

> because the Company requires additional time to complete the quarter-end review ***as a result of the recently announced principal executive officer change*** disclosed on the Company's Current Report on Form 8-K filed on May 15, 2025 (the "Form 8-K"), as well as the need to complete an assessment of the impact on the Company's control environment, including the impact on management's assessment of the effectiveness of internal controls over financial reporting, as a result of the Code of Business Conduct and Ethics inquiry by the Audit Committee of the Company's Board of Directors noted in the Form 8-K.

138. The fact that Defendants knew at the time of filing the 1Q25 Press Release that the Company would not be able to timely file its Form 10-Q for the first quarter of 2025 establishes a strong inference that they knew this inability resulted from Russell's imminent departure, which they failed to disclose in the 1Q25 Press Release.

## VIII. CLASS ACTION ALLEGATIONS

139. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of all persons and entities that purchased publicly traded shares of the Company's Class A common stock during the Class Period and were damaged thereby.

140. Excluded from the Class are Defendants, the Company, all current and former officers and directors of the Company, their immediate family members, and any entity that any Defendant or the Company owns or controls (or owned or controlled during the Class Period).

141. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's Class A common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

142. Plaintiffs' claims are typical of the claims of Class members as all were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

143. Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

144. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether Defendants' acts violated the federal securities laws as alleged herein;
- whether Defendants made materially false or misleading statements to the investing public during the Class Period;
- Whether Defendants caused the Company to issue false and misleading statements during the Class Period; and
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the price of the Company's Class A common stock was artificially inflated during the Class Period because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

145. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

146. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- Defendants' omissions and misrepresentations were material;
- The Company's Class A common stock traded in an efficient market;
- The Company's Class A common stock was liquid and traded with moderate to heavy volume during the Class Period;
- The Company's Class A common stock traded on the Nasdaq and the Company was covered by multiple analysts during the Class Period;
- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's Class A common stock; and
- Plaintiffs and members of the Class purchased, acquired and/or sold the Company's Class A common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

147. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

148. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. COUNTS

### COUNT I

### For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Against Defendants

149. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

150. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other Class members to purchase Luminar's Class A common stock at artificially inflated prices.

151. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

152. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

153. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the Company's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

155. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for the Company's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

156. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

157. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## For Violations of Section 20(a) of the Securities Exchange Act of 1934 Against Defendants

158. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

159. Defendant Russell was the co-founder and CEO of the Company, as well as the Chairman of its Board, until stepping down in May 2025, though he remained a member of the Board. Russell was directly involved in the day-to-day management of the Company, including its communications to investors. Russell spoke on behalf of the Company during earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, and certified those filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, Russell had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

160. Defendant Fennimore was the CFO of the Company as well as its interim CEO for approximately two weeks after Defendant Russell stepped down. Fennimore was directly involved in the day-to-day management of the Company, including its communications to investors. Fennimore spoke on behalf of the Company during earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, and certified those filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, Fennimore had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action is a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be

proven at trial, including prejudgment and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated: January 26, 2026

By: */s/ Jonathan D. Park*

Jeremy A. Lieberman
(*pro hac vice*)
J. Alexander Hood II
(*pro hac vice*)
Jonathan D. Park
(*pro hac vice*)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jpark@pomlaw.com

*Counsel for Co-Lead Plaintiff Hook Chok and Co-Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLP**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Co-Lead Plaintiff Hook Chok*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (Fla. Bar No. 0182877)
Yu Shi (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
yshi@rosenlegal.com

*Counsel for Co-Lead Plaintiff Dong Pan and Co-Lead Counsel for the Class*

**SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
Facsimile: (877) 590-0483
brian@schallfirm.com

*Additional Counsel for Co-Lead Plaintiff Dong Pan*